IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JBS HAIR, INC.,

        Plaintiff,

    v.

SUN TAIYANG CO., LTD.,

        Defendant.

CIVIL ACTION

NO. 1:21-cv-01857-MLB

**JURY TRIAL DEMANDED**

**Opening Markman Claim Construction Brief**

## I.    BACKGROUND

### A.    The Patents-in-Suit and Claims at Issue

There are three patents asserted against Defendant Sun Taiyang, namely U.S. Patent No. 10,786,026 ("the '026 patent") (Ex. A),1 U.S. Patent No. 10,945,478 ("the '478 patent) (Ex. B), and U.S. Patent No. 10,980,301 ("the '301 patent") (Ex. C).  The patentee, Plaintiff JBS Hair Inc. ("JBS"), has accused Sun Taiyang of directly or indirectly infringing claims 1, 9-12, 15, and 17 of the '026 Patent, claims 17-20 of the '478 Patent, and claims 1, 4-9, and 11 of the '301 Patent.

The patents-in-suit issued from the same family of patent applications.  The '478 Patent is a continuation-in-part of application Ser. No. 15/380324 which issued

as the '026 patent.  The '301 patent is a continuation application claiming priority from application Ser. No. 15/380324 which issued as the '026 patent.

In the Joint Claim Construction Statement, the parties have not agreed upon any proposed construction of claim terms or phrases.  Dkt. No. 56 in Civil Action No. 1:21-cv-01857-MLB. Each of the disputed claim terms identified as requiring construction is discussed herein. Terms are grouped together to the extent they incorporate common subject matter in connection with their construction and among the patents-in-suit.

The patents-in-suit generally relate to the arrangement and packaging of bundles of synthetic hair that are primarily used for braiding. While these hair bundles that are the subject of these patents have existed in the marketplace for years before the inventors' applications, the inventors were able to present these applications as novel concepts.  The hair bundles described in the patents are either of differing lengths, or at identical lengths but arranged at offset intervals.  The hair bundles are then bound in the middle (designated as a "waist") with something akin to a rubber band, and then folded in the middle and packaged.  The binding and folding of the hair create an elongated heart-shaped bundle (deemed "cardioid" in the claims and specifications) which is then bound to a backing and has a front flap.

The bundled hair product is also described as narrowing from the middle of the folded bundle.

### B.      Legal Standards for Claim Construction

Claim construction is a question of law.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967,979 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). The Court "has an independent obligation to determine the meaning of the claims, notwithstanding the views asserted by the adversary parties." *Exxon Chem. Patents, Inc. v. Lubrizol Corp*., 64 F.3d 1553, 1555 (Fed. Cir. 1995); *Markman*, 517 U.S. at 373 ("[A] patent must describe the exact scope of an invention and its manufacture to secure to [the patentee] all to which he is entitled, [and] to apprise the public of what is still open to them.") (emphasis added; internal citations omitted). Claim construction is significant in providing proper notice to the public as to what inventions are and are not covered by the patent.  *See id.*

In the present case, the disputed terms cannot simply be given their plain and ordinary meaning, and thus require construction by the Court.

Claim construction begins with an analysis of a patent's intrinsic evidence. *Vitronics Corp. v. Conceptronic, Inc*., 90 F.3d 1576, 1582-83 (Fed. Cir. 1996). The claims define the scope of the rights protected, so "naturally 'the claims themselves provide substantial guidance as to the meaning of particular claim terms.'" *Abbott*

3

*Labs. v. Sandoz, Inc*., 566 F.3d 1282, 1288 (Fed. Cir. 2009) (en banc), cert. denied, 558 U.S. 1136 (2010) (quoting *Phillips v. AWH Corp*., 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc)); *Digital Biometrics, Inc. v. Identix, Inc*., 149 F.3d 1335, 1344 (Fed. Cir. 1998) (generally, claim's language given its ordinary and customary meaning). "But the claims 'must be read in view of the specification, of which they are a part,'" to determine the proper meaning. *Abbott*, 566 F.3d at 1288 (quoting *Markman*, 52 F.3d at 979).

The interpretation of a claim term can only be determined and confirmed with a full understanding of what the inventor actually invented and intended to envelop with the claim language. The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction. *Renishaw PLC v. Marposs SpA,* 158 F.3d 1243, 1250 (Fed. Cir. 1998). In furtherance of this full understanding, an invention must be construed with reference to the prosecution history. *Research Plastics, Inc. v. Federal Packaging Corp*., 421 F.3d 1290, 1296 (Fed. Cir. 2005) (citing *Graham v. John Deere Co*., 383 U.S. 1, 33 (1966)). The prosecution history is part of the "intrinsic evidence' of the meaning of the claims, because it 'provides evidence of how the [United States Patent & Trademark Office (PTO)] and the inventor understood the patent.'" *Abbott*, 566 F.3d at 1288-89. The intrinsic evidence also

includes "prior art cited in a patent or cited in the prosecution history of the patent." *V-Formation v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005). The prosecution history and prior art can provide especially useful information regarding how the PTO understood the patent, particularly, as here, when the PTO analyzed the limits of the disclosures of the patents-in-suit in issuing related patents.

Finally, though the Federal Circuit emphasizes the importance of intrinsic evidence in claim construction, it has also authorized district courts to rely on extrinsic evidence, which consists of "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries and learned treatises." *Markman*, 52 F.3d at 980. Extrinsic evidence is admissible and may shed useful light on the relevant art, but it needs to be considered in the context of the intrinsic evidence. *Phillips*, 415 F.3d at 1318-19.

## II.   <u>CONSTRUCTION OF DISPUTED CLAIM TERMS</u>

As stated above, the patents-in-suit generally relate to the arrangement and packaging of "bundled synthetic braiding hair."  The inventors here took what may have otherwise been simple concepts and described them in the patent claims in technical terms beyond what a lay juror would understand.  As such, construction of these technical terms is necessary.  Further, in serving as their own lexicographers, the inventors here have precisely defined certain terms in the specification.  Those

definitions are required to be construed terms consistent with the specification.  As to other terms in the patent claims, those terms have technical meanings beyond what a layperson would understand and therefore require construction.

### A.    "substantially cardioid shaped perimeter"

| Term/Claims | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "substantially cardioid shaped perimeter"<br><br>**'026**: 9:61-62 | Plain meaning | A perimeter wherein the ratio of the length to the width (with length measured from the cusp to the rounded end opposite the cusp, and width measured at the widest point perpendicular to the length from the cusp to the rounded end opposite the cusp) varies from a cardioid shape (i.e., a heart-shaped curve traced by a fixed point on the circumference of a circle rolling around another circle of equal radius) by no more than $2.\overline{2}\%$, and wherein the end opposite the cusp is rounded |

The parties dispute whether the term "substantially cardioid shaped perimeter" should be given its plain and ordinary meaning, or whether it should be construed to apply the specific definition for the term as set forth by the inventors in the specification.

6

It is well settled that the specification may define a claim term and that, when it does, "the inventor's lexicography governs." *Phillips v. AWH Corp*., 415 F.3d at 1316. "To act as its own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Cont'l Circuits LLC v. Intel Corp*., 915 F.3d 788, 796 (Fed. Cir. 2019); *Pacing Techs., LLC v. Garmin Int'l, Inc*., 778 F.3d 1021, 1024 (Fed. Cir. 2015); *Thorner v. Sony Comput. Entm't Am. LLC,* 669 F.3d 1362, 1365 (Fed. Cir. 2012).

The Federal Circuit has explained that "the specification acts as a dictionary when it expressly defines terms used in the claims *or when it defines terms by implication*." *SightSound Techs., LLC v. Apple Inc*., 809 F.3d 1307, 1317 (Fed. Cir. 2015) (emphasis in original) (quoting *Phillips v. AWH Corp.*, 415 at 1315). And "when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'" *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group*, 262 F.3d 1258, 1271 (Fed. Cir. 2001); see, e.g., *id*. at 1273 ("[T]he patentees defined the term 'mode' by implication, through the term's consistent use throughout the ′786 patent specification."); *Nystrom*, 424 F.3d at 1145-46 (construing the term "board" narrowly based on the specification's consistent use of the term).

Here, the specifications in each of the patents-in-suit define the term "substantially" as follows: "The terms 'substantially' and 'about' are used to refer to dimensions, orientations, or alignments inclusive of manufacturing tolerances. Thus, a 'substantially orthogonal' angle with a manufacturing tolerance of plus or minus two degrees would include all angles between 88 and 92, inclusive." Exhibit 1, '026 patent, 2:29-34; Exhibit 2, '478 patent, 2:53-58; Exhibit 3, '301 patent, 2:38-43. In the example given by the inventors, the term "substantially" is modifying a geometric description ("orthogonal" in this example).

In the patents-in-suit the term "substantially" is only used to describe the geometric description "cardioid" as in "substantially cardioid shaped perimeter." This occurs within the patent claims of the '026 patent and the '301 patent and throughout the specifications for each of the patents-in-suit. Exhibit 1 ('026 patent) 2:9-14, 2:29-34, 3:17-32, 5:13-42, 5:67-6:9, 6:53-57, 6:65-7:3, Figs. 4-6, claims 1, 9, 11, 12, and 17; Exhibit 2 ('478 patent) 2:33-38, 2:53-58, 4:1-25, 6:5-35, 7:3- 16, 8:37-9:12, 9:46-55, 10:39-43, 10:51-58, 14:9-13, 14:21-28, Figs. 4, 8-10; Exhibit 3 ('301 patent) 2:38-43, 3:26-41, 5:22-51, 6:9-17, 6:61-65, 7:6-13. Thus, when "substantially" is used to modify or describe the geometric description of "cardioid shaped perimeter" it necessarily must be done according to the inventors' own lexicography. Given the inventors' specific definition of the term "substantially," it

must be applied to the described term.  Thus, "substantially" means having a tolerance of plus or minus two degrees in relation to the cardioid shaped perimeter.

Further, having described the shape of the perimeter as "substantially cardioid" it necessarily follows that there must be a "cusp end" and a "rounded end." These are prerequisites of a cardioid shape as described in the specification.  A cardioid itself is a shape formed when "a circle of fixed radius is rotated about another circle with a point at the intersection of the fixed radius drawing the cardioid."  See Exhibit 1 ('026 patent), 5:17-18.  The cardioid is represented by the following shape:



https://en.wikipedia.org/wiki/Cardioid#cite_ref-3 (accessed July 20, 2022).  This reference also shows the shape being generated by rotating a circle of the same fixed radius around the perimeter of a circle.

Defendant's proposed construction achieves this objective of being a "substantially cardioid shaped perimeter" in the most reasonable way possible, and

in accordance with the example given by the inventors in the specification. Defendant's proposed construction looks at the ratio of the "cardioid shaped perimeter's" ratio of length to width and allows it tolerances consistent with the defined term "substantially." A cardioid itself is a shape formed when "a circle of fixed radius is rotated about another circle with a point at the intersection of the fixed radius drawing the cardioid."  See Exhibit 1 ('026 patent), 5:17-18.  Defendant's proposed construction allows for the device to maintain its substantially "cardioid shaped" perimeter within the tolerances set forth in the specification.  Accordingly, Defendant's proposed construction is in harmony with the inventors' own definitions.

Further, the Federal Circuit has previously found that the term "substantially" can be subject to claim construction. *See LNP Engineering Plastics,* 275 F.3d 1347, 1354 (Fed. Cir. 2001) (the term "substantially completely wetted" required construction in order to specify proper composition); *Ecolab, Inc. v. Envirochem, Inc.* 264 F.3d 1358, 1366–69 (Fed. Cir. 2001) (the term "substantially uniform" required construction in order to clarify the uniformity of the material); *York Products, Inc. v. Central Tractor Farm & Family Center* 99 F.3d 1568, 1572–73 (Fed. Cir. 1996) (the term "substantially the entire height thereof" required construction indicating how high ridges must cover a side wall).

Plaintiff's proposed construction of "plain meaning" for "substantially cardioid shaped perimeter" is unavailing. First, as explained above, a plain meaning construction does not account for the inventors' explicit definition of "substantially" as set forth in the specification. As such, it does not inform the jury of the clear intentions of the inventors.

Second, Plaintiff's proposed construction is unusable because it does not explain technical terms which would be beyond the understanding of laypersons. The purpose of claim construction is to provide guidance to the jury or other fact-finder as to the meaning of patent claim terms that the jury would not otherwise be capable of understanding. *Sulzer Textile A.G. v. Picanol N.V.*, 358 F.3d 1356 (Fed. Cir. 2004). Claim construction is therefore necessary if a claim uses a term that is not familiar to those outside of the technical field of the invention, or because the patentee used a word idiosyncratically, in contradiction to its ordinary meaning. *Phillips v. AWH Corp.*, 415 F.3d at 1314.

Here, the term "cardioid" itself is a technical geographic and mathematical term that is beyond the understanding of a layperson. Indeed, even within this field of art, bundled hair for braiding, "cardioid" is not a commonly used term. When the patent examiner ran a search of terms upon the initial examination of the '026 patent, the term "cardioid" did not return any hits in combination with several searches

involving hair.   As the file history shows, the term "cardioid" combined with "braiding" and "hair" yielded zero search results.  There were also zero search results for the combination of "cardioid" with "hair" adjacent to "extensions."[1]   This strongly confirms that even those persons of skill in the art with hair for braiding would find the use of the term "cardioid" to be unfamiliar with such persons.  See Exhibit 4 (file history for '026 patent) at page 60.

Accordingly, Plaintiff's proposal that "substantially cardioid shaped perimeter" can be given a plain and ordinary meaning must fail.  The specification has a specific definition of "substantially" that the inventors chose and must be applied.  Further, the terms themselves are technical and require construction for lay persons.   Defendant's construction most accurately reflects what the inventors conveyed to the Patent Office as the scope of the invention is related to this term.

---

[1] A search for "hair" and cardioid near shape appeared to yield 10 hits.  But, none of the searches that relate most closely to this field of bundled braiding hair appeared to have any hits with "cardioid."

**B.**   **"cardioidal lobes"**

| Term/Claims | Plaintiff's | Defendant's Construction |
|---|---|---|
| "cardioidal lobes"<br><br>'301 patent, claim 6 | Plain meaning | Rounded projecting parts that possess the shape and dimensions of the rounded projecting parts of a cardioid (i.e., a heart-shaped curve traced by a fixed point on the circumference of a circle rolling around another circle of equal radius) |

The parties dispute whether the term "cardioidal lobes" as used in claim 6 of the '301 patent should be given a plain and ordinary meaning, or whether these technical terms are beyond the understanding of a layperson and therefore require construction.

As stated above, the terms "cardioid" and, similarly, "cardioidal" are technical terms that are beyond the understanding of laypersons.   Without a baseline understanding of what "cardioid/cardioidal" or "lobes" means, the jury would be without proper guidance.   The same holds true for "lobes" here which would be presented to the jury without context if not defined with "cardioidal."   The jury would benefit from construction that describes these concepts in plain English. *See,*

*e.g., Enerpol, LLC v. Schlumberger Tech, Corp.*, No. 2:17-cv-00394-JRG, Dkt. No. 111, pp. 20–21 (E.D. Tex. Mar. 15, 2018) (construing "continuous liquid phase" as "polymer in a liquid state that is greater than fifty percent (50%) by volume of the fluid that does the fracturing in the formation"); *Oyster Optics, LLC v. Coriant America, Inc. et al.,* No. 2:16-cv-1302-JRG, Dkt. No. 615 pp. 6–9 (Jun. 21, 2018) (construing the technical term "phase modulate" with many clarifying words to be "alter the phase of light to create an optical signal having a phase that is representative of data. Use of phase modulation excludes use of amplitude modulation."); *Nichia Corp. v. Everlight Elecs. Co.*, No. 2:13-CV-702-JRG, 2014 WL 7149169, at *8 (E.D. Tex. Dec. 12, 2014), *aff'd sub nom., Nichia Corp. v. Everlight Americas, Inc.*, 855 F.3d 1328 (Fed. Cir. 2017) (construing the phrases "wall formed to extend across the bottom surface of the recess" as "a protruding structure that extends across the bottom surface of the recess" and "notch which is formed by cutting off a portion of an edge of the first lead electrode" as "a cut-out portion in an edge of the first lead electrode which is formed by cutting").

Here, the specification for the '301 patent only provides a single context for understanding what a "cardioidal lobe" is outside of the claims themselves.  It provides that description in the context of defining "substantially cardioid shaped perimeter."  In that regard, the specification states:

As shown in FIG. 4, the folded bundled synthetic braiding hair 400 defines a substantially cardioid shaped perimeter 401. The term "substantially" is used because while the substantially cardioid shaped perimeter 401 is not a perfect cardioid as would be the case when a circle of fixed radius is rotated about another circle with a point at the intersection of the fixed radius drawing the cardioid, it has a cardioid appearance in that it includes a cusp 403 and two cardioidal lobes.

Exhibit 3 ('301 patent), 5:22-30.  With the inventors having already established what "substantially" means (see '301 patent, 2:38-43), they now describe a "non perfect" cardioid shape consisting of at least a cusp and "two cardioidal lobes."  Defendant's proposed construction of "rounded projecting parts that possess the shape and dimensions of the rounded projecting parts of a cardioid (i.e., a heart-shaped curve traced by a fixed point on the circumference of a circle rolling around another circle of equal radius)" gives contextual meaning to the term "cardioidal lobes" and better describes to a layperson what the scope of the invention is.

Again, a plain meaning construction of the term "cardioidal lobes" is unavailing.  First, it does not help the layperson understand what is meant by that term.  Further, it does not take into account how the inventors have described those terms in the specification.  On the other hand, Defendant's proposed construction accurately captures what the inventors disclosed as their invention.

### C.   **"rounded side/rounded end"**

| Term/Claims | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "rounded side/rounded end" '026 patent, claims 9, 11, 17;'301 patent, claims 9, 11 | Plain meaning | The side or end of the substantially cardioid shaped perimeter opposite the cusp side, which must have an appearance shaped like a ball or circle |

The parties dispute whether the term "rounded side/rounded end" as used in claims 9, 11, and 17 of the '026 patent and claims 9 and 11 of the '301 patent should be given a plain and ordinary meaning, or whether these are terms defined by the inventors in the specification and therefore require construction.

Defendant proposes the following construction for that term: "the side or end of the substantially cardioid shaped perimeter opposite the cusp side, which must have an appearance like a ball or a circle."   This construction is most consistent with how the inventors used "rounded" throughout the specification.

When a patentee "uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'" *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group*, 262 F.3d 1258, 1271 (Fed. Cir. 2001).   In this case, the inventors' use the term "rounded side/rounded end" throughout the claims and specifications in the same manner. Each use of that term, in all three specifications, is in connection with describing an

end or side of a cardioid shape.  See Exhibit 1 ('026 patent) at 2:40-58, 3:23-27, 5:21-42, 5:67- 6:9, 6:13-19, 6:65-7:3; Exhibit 2 ('478 patent) at 2:64-3:18, 4:13-25, 6:13-35, 8:37-9:23, 9:46-55, 9:58-67, 10:51-58; and Exhibit 3 ('301 patent) at 2:49-67, 3:32-36, 5:30-51, 6:9-17, 6:21-27, 7:6-13.  That term is also used in the same manner in each of the asserted claims incorporating the term.  See Exhibit 1 ('026 patent) claims 9, 11, and 17; Exhibit 3 ('301 patent) claims 9 and 11.  For example, in the '026 patent, in each instance where the term "rounded end" or "rounded side" is used, it is within the context of describing a portion of the "substantially cardioid shaped perimeter." As cited, the specification and the claims disclose:

- The substantially cardioid shaped perimeter 401 also resembles an inverted teardrop with a rounded end instead of a pointed one, 5:21-23

- When this occurs, a rounded side 504 of the substantially cardioid shaped perimeter (401) of the folded bundled synthetic braiding hair is visible, 5:67- 6:2

- a rounded side 504 of the substantially cardioid shaped perimeter (401) disposed opposite a cusp side, 6:3-5

- due to exposure of the a (sic) rounded side 504 of the substantially cardioid shaped perimeter, 6:16-17

- In one embodiment, this disposition is such that a rounded side of the substantially cardioid shaped perimeter disposed opposite a cusp side of the substantially cardioid shaped perimeter is exposed, 6:66-7:2

- The hair accessory of claim 1, the substantially cardioid shaped perimeter comprising a rounded side and a cusp side.  Claim 9

- The hair accessory of claim 1, wherein a rounded side of the substantially cardioid shaped perimeter opposite a cusp side of the substantially cardioid shaped perimeter is exposed beneath a portion of the backer panel partially spanning the second side of the bundled synthetic braiding hair.  Claim 11

Each of these references to a "rounded end" or "rounded side" is therefore tied to the substantially cardioid shaped perimeter.  As stated above, a cardioid is a geometric shape formed when "a circle of fixed radius is rotated about another circle with a point at the intersection of the fixed radius drawing the cardioid."  The cardioid is represented by the following shape (outlined in red):



https://en.wikipedia.org/wiki/Cardioid#cite_ref-3 (accessed July 20, 2022).  The rounded end of the cardioid (the left side above) will necessarily have an appearance of a ball or circle, even within tolerances or variances of 2.2 percent, as would be required to achieve a "substantially cardioid shaped perimeter" as required in this patent.

Thus, Defendant's proposed construction most accurately reflects the inventors' intent as disclosed in the specification and claims.

### D.   **"middle"**

| Term/Claims | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "middle"<br><br>'478 patent, claim 17; '301 patent, claim 1 | Plain meaning | Entire section between the end collocated with the waist and the end located distally from the waist |

The parties dispute whether the term "middle" as used in claim 17 of the '478 patent and claim 1 of the '301 patent should be given a plain and ordinary meaning, or whether this term requires construction to assist the jury.

The use of the term "middle" in these asserted claims is vague, ambiguous and does not provide guidance to the jury on what constitutes a "middle."  Claim 17 of the '478 patent recites:

> A hair accessory, comprising:
> bundled synthetic braiding hair, comprising:
> a first bundle of synthetic hair strands having a first length; and a second bundle of synthetic hair strands having a second length that is shorter than the first length;
>
> wherein the bundled synthetic braiding hair is folded about a waist of the bundled synthetic braiding hair to define a perimeter having a first end collocated with the waist, a **middle**, and a second end located distally from the waist; and

> wherein a width of the perimeter narrows as the bundled synthetic braiding hair extends distally from the **middle** to the second end

See Exhibit 2 ('478 patent), claim 17 (emphasis added).

It is unclear whether the "middle" means the halfway point between the end collocated with the waist and the opposite end, or whether it means some portion of that distance, or if it means the entire distance between the two points.

The claim itself suggests that middle means the entire distance between the two ends. The claim describes three distinct portions of a folded bundle of synthetic hair. It describes the folded bundle as being defined by: (1) "a first end collocated with the waist;" (2) "a middle;" and (3) "a second end located distally from the waist." There are no other attributes or portions associated with the folded bundle other than those three portions. Accordingly, with the two ends being defined, the only remaining portion of the structure would be the entire section between the two ends, or the "middle."

Claim 1 of the '301 patent expresses a nearly identical expression of "middle." Claim 1 discloses, in relevant part:

> wherein the bundled synthetic braiding hair is folded about a waist to define a perimeter having a first end collocated with the waist, a **middle**, and a second end located distally from the waist; and wherein a width of the perimeter narrows as the bundled synthetic braiding hair extends distally from the **middle** of the perimeter to the second end.

See Exhibit 3 ('301 patent), claim 1.  Again, the claim suggests that the "middle" consists of the entire distance of the folded hair bundle between its two ends.

Other than, perhaps, the drawings, the specifications are silent on what the term "middle" is intended to mean.  If anything, Figure 4 from the '301 patent also suggests that the "middle" is the entire distance from one end to the other end.



halfway

Starts narrowing here

*FIG. 4*

As shown in this figure, there is no significant narrowing at the "middle" as described in the claims. The only noticeable narrowing occurs at more than ¾ toward the end opposite the folded waist. There are portions in the figure where the bundled hair narrows and then widens again (at the halfway point).

The construction offered by Defendant provides an explanation of what middle is that is supported by the claims and the specification. Plaintiff's proposed construction of plain meaning is hopelessly vague and would only confuse the fact finder.

### E.   **"narrows"**

| Term/Claims | Plaintiff's Construction | Defendant's Construction |
|---|---|---|
| "narrows" <br><br> '478 patent, claim 17; '301 patent, claim 1 | Plain meaning | Decreases continuously |

The parties dispute whether the term "narrows" as used in claim 17 of the '478 patent and claim 1 of the '301 patent should be given a plain and ordinary meaning, or whether this term requires construction to assist the jury.

Similar to the term "middle," the use of the term "narrows" in these asserted claims is vague and ambiguous and does not provide guidance to the jury on what constitutes "narrows." Construction is needed because it is not clear from either the

claims of the specification whether "narrows" is intended to be a narrowing of the hair bundle at any point, or whether the bundle has to narrow consistently and continuously. As used in Claim 1 of the '301 patent, for example, the claim states as follows: "wherein a width of the perimeter **narrows** as the bundled synthetic braiding hair extends distally from the middle of the perimeter to the second end." See Exhibit 3 ('301 patent), claim 1 (emphasis added). Again, there is little support in the specification. In fact, the drawings themselves cause confusion in terms of what is meant by narrows.

Again, looking at Figure 4, it appears that the folded hair bundle narrows both at the halfway point between the two ends, and it "narrows" at either end.



Patent          Apr. 20, 2021     Sheet 3 of 7        US 10,980,301 B1

*FIG. 4*

Accordingly, construction is needed to inform the fact-finder what is meant by "narrows." Here, an extrinsic reference would aid in clarification. The dictionary definition offered by Plaintiff provides appropriate guidance. See, Exhibit 5. Accordingly, the Court should adopt the above construction.

## III.   **CONCLUSION**

For all of the reasons above, Defendant respectfully requests that the Court enter its proposed constructions.

This 22ⁿᵈ day of July 2022.

*/s/Coby S. Nixon*

Anthony J. Dain
(admitted pro hac vice)
anthony.dain@procopio.com
**Procopio, Cory, Hargreaves &**
**Savitch LLP**
525 B Street, Suite 2200
San Diego, CA 92101
Telephone: 619.238.1900
Facsimile: 619.235.0398

Coby S. Nixon
cnixon@taylorenglish.com
Georgia Bar No. 545005
Seth K. Trimble
strimble@taylorenglish.com
Georgia Bar No. 851055
**Taylor English Duma LLP**
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Phone: (770) 434-6868
Fax: (770) 434-7376

Attorneys for Defendant
Sun Taiyang Co., Ltd., Corp.

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1D, counsel certifies that the foregoing was prepared in Times New Roman, 14 point font, in compliance with Local Rule 5.1C.

*/s/ Coby S. Nixon*
Coby S. Nixon
Attorney for Sun Taiyang Co., Ltd.